ANTHONY MARTIN
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
District of Arizona
LISA E. JENNIS
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: lisa.jennis@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States America, | Case No. 20-3058MJ-001-PHX-MTM |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER** |
| vs. | |
| Chauncy Hollingberry, | |
| Defendant. | |

The United States, through undersigned counsel, opposes Defendant Chauncy Hollingberry's Motion/Appeal to Revoke Detention Order pursuant to 18 U.S.C. § 3145(b). (Doc. 16 and 17.) Defendant does not raise any new information except to claim that there is an increased danger of COVID-19 to incarcerated individuals. This claim does not undermine the propriety of detention under 18 U.S.C. § 3142(e) nor justify temporary release under 18 U.S.C. § 3142(i). Defendant remains a serious danger to the community, a serious flight risk, and CoreCivic has implemented numerous preventative and treatment-based protocols to address any COVID-19 cases should they arise.

**I.  Factual and Procedural Background**

  *a. Offense Conduct*

Defendant is charged in by complaint with cyberstalking pursuant to 18 U.S.C. § 2261A(2). (DOC. 1.) Defendant acted in retaliation against the victim (hereinafter "Victim K") for having videos with her image or information removed from his YouTube Channel, Law Offices of Daddy and Master aka Chauncey Dragonfyre. YouTube removed a video from a July 2018 interaction at the Arizona Attorney General's Office (AGO) where the

Phoenix Police Department (PPD) responded to the AGO and charged defendant with trespassing.[1] PPD spoke with Victim K in her work capacity and she later filed a privacy complaint after Defendant posted the PPD Officer's bodycam video on his YouTube channel. Thereafter, for approximately 14 months, Defendant called and visited the AGO complaining about AGO employees getting privacy complaints against him and the AGO's no filming policy. In January 2020, Defendant's harassing conduct against Victim K escalated. In January 2020, he filmed himself threatening to file a complaint against Victim K, calling her a "bitch" on the video. He asked the viewers watching his YouTube videos to send him Victim K's home address, phone numbers, pictures and any dirt that they have on her or another AGO employees. Defendant told Victim K's co-workers to blame her for his actions. In response to the video, viewers of Defendant's YouTube channel, wrote derogatory posts threatening physical harm and even death. They posted her address, the value of her home, and other personal information. All the while, Defendant kept returning to the AGO and filming Victim K's office requiring her to have security escort her to and from work. Defendant has repeatedly publicized the victim's personal information and has routinely referred to her in a derogatory fashion. See Complaint. (Doc. 1.)

Victim K isn't the only person that Defendant has victimized and several of those victims wrote letters urging the Magistrate Judge to detain the defendant. See Attachment A. These letters detail Defendant's history of stalking and terrorizing members of this community. The victims vividly describe the fear, emotional distress and anxiety caused by Defendant. Two victims, in addition to Victim K, have current Injunctions Against Harassment against Defendant.

On January 24, 2020, Defendant was served with an Injunction Against Workplace Harassment to stop his harassment of Victim K. He ignored it and within days sent out a mass email to Victim K's co-workers and compiled an email list of 56 government workers,

---

[1] Trespassing charges were later dismissed.

including Victim K, directing his followers to email bomb the people on the list. This list was publicly available to all viewers.

As previously mentioned, there are two other Injunctions Against Harassment against Defendant. One of them was filed by Defendant's uncle in December 2019. Defendant also ignored that court order and continued to publicly talk about his uncle in disparaging ways on video and on March 7, 2020, sent an email to his uncle's counsel, in which he says he is "doing everything I can to cause your client to physically die." Defendant mentioned several times in videos that he had level 5 body armor and was going to the gun range. He posted a poll on YouTube asking whether he should go to "a synagogue on the public sidewalk with body armour [sic], an AR-15 assault rifle and a camera?"[2]

In addition to harassing individuals, Defendant frequently goes to state and federal buildings to film employees and members of the public visiting those locations. He films at public schools, churches and synagogues. He attempts to incite people by carrying "fuck Jesus" signs outside of churches and goes to synagogues wearing a burka, pretending not to speak English and stating "Allah Akbar" which means "God is Greater", an Islamic declaration of faith used in the opening declaration of every Islamic prayer. This phrase has also been used as a "battle cry" in various religious and military conflicts and when committing acts of terrorism or religious or political violence. He posts these videos on his YouTube channel.

The nature and circumstances of the offense support detention. The offense with which Defendant is charged is a serious crime of violence that involved conduct intended to harass and intimidate Victim K and cause reasonable fear of serious bodily injury to the victim and her family. By spreading disparaging information about the victim, to the public and to her co-workers, Defendant turned the internet into a weapon of terror. The victim received threats to harm her and her family members from unknown persons some of whom

---

[2] A search warrant was executed at Defendant's home and on his vehicle and no firearms or body armor was located.

appear to subscribe to Defendant's YouTube channel. These threats cannot be dismissed as idle. Rather, Defendant intended to incite hate and/or violence against the victim and her family, and his actions proved successful.

Defendant is also a danger to his mother and he has access to all her money. Defendant's mother, age 59, was interviewed by law enforcement on March 13, 2020, after Defendant's arrest. She lives with the defendant and stated that she hasn't left the home since they moved there approximately two years ago. She stated that the defendant told her that if she left the apartment, the home would be raided by government freeloaders and criminals that were always watching the apartment and waiting for her to leave. She told law enforcement that she used to enjoy a life of hiking and biking but is now afraid to leave her home. She stated that defendant controls all her finances and her inheritance checks. During an interview with FBI, defendant told them that his mother signs her monthly checks from a trust for which she is the beneficiary. A review of those checks shows that they are mailed to defendant's Post Office Box and are signed over to Defendant. On March 13, 2020, Defendant told federal agents he does not have a power of attorney but that is untrue. Defendant's has had power of attorney for his mother since July 2013 as it is an exhibit to a civil complaint for Libel filed December 5, 2019, in Superior Court of California, County of Santa Barbara against the defendant by his uncle. Defendant was untruthful with law enforcement and this is an indicator that he may not be truthful with the Court and follow conditions if released.

Defendant's history of animosity is particularly troubling and relevant for purposes of detention as he has already-demonstrated he is capable of inciting violence toward the victim and her family. Defendant's actions demonstrate that he is becoming more and more dangerous. On March 13, 2020, He was physically violent with a security guard and continues to harass and torment the victims despite receiving court orders to the contrary.

For these reasons, the nature and seriousness of the danger to Victim K cannot be understated. This danger is multi-faceted, posing both a significant risk to Victim K's emotional and mental well-being as well as a danger to Victim K and her family's physical

safety. The defendant's crime was, in essence, cyber-facilitated violence, and supports detention.

Applying the factors set forth in 18 U.S.C. § 3142(g), Judge Fine found ample evidence to support a finding that no conditions of release will reasonably assure the safety of the victim, her immediate family members, and others. Nor are there any conditions that negate the risk that Defendant will obstruct or attempt to obstruct justice.

*b. Detention Proceedings*

Defendant was arrested by the Phoenix Police Department on March 13, 2020 and has his initial appearance in Federal Court on March 16, 2020. A pretrial services report was prepared and it recommended release. (Doc. 5.) Following a detention hearing, Magistrate Judge Fine ordered Defendant detained and issued an Order of Detention on March 23, 2020. (ECF No. 12.) Judge Fine determined that based on clear and convincing evidence that Defendant was a danger to the community (ECF No. 12 at 2.)

Defendant now moves to revoke the detention order by claiming there are conditions of release that adequately address his dangerousness and also states release is appropriate due COVID-19 pandemic and increased danger to inmates.

**II. Law and Argument**

*a. Cyberstalking is a Crime of Violence.*

Judge Fine found that Cyberstalking is a crime of violence. A "crime of violence" under the Bail Reform Act includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 3156(a)(4)(A), and "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," 18 U.S.C. § 3156(a)(4)(B). The latter definition, sometimes referred to as the "residual clause," is "intended to cast a wider net, specifying that it relates to any other offense that does not necessarily involve violence but by its nature involves a substantial risk that physical force may be used in committing the offense." *United States v. Flores-Ortiz*, Crim. No. 15-605 (PAD), 2015 WL

7574765, at *3 n.2 (D.P.R. Nov. 25, 2015) (citing *United States v. Dillard*, 214 F.3d 88, 92 (2d Cir. 2000)).

To determine whether a particular offense is a crime of violence, courts in the Ninth Circuit employ the categorical approach. *See*, *e.g.*, *United States v. Montoya*, 486 F. Supp. 2d 996, 1002 (D. Ariz. 2007). Under the categorical approach, courts do not evaluate facts specific to the case, nor do they inquire "whether the statutory elements of a crime require (or entail) the creation of such a risk in each case that the crime covers." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1211 (2018). Rather, the Court inquires whether the "ordinary case" of an offense presents a substantial risk that physical force against the person or property of another will be used in the course of committing the offense. *Id*.

While the Ninth Circuit has not yet considered the issue, courts across the country have consistently found cyberstalking to be a crime of violence under the Bail Reform Act. *See United States v. Kukstis*, No. 4:18-mj-04174-DHH (D. Mass. May 04, 2018) (Memorandum and Order on Detention); *United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D.N.Y. 2018); *United States v. Grooms*, 3:15-mj-00025, 2015 WL 1982097, at *5 (S.D. W. Va. Apr. 29, 2015); *United States v. Shrader*, No. 1:09-cr-00270, 2010 WL 503092, at *3 (S.D. W. Va. Feb. 8, 2010); *United States v. Neuzil*, No. 09-CR-2020-LRR, 2009 WL 2030373 (N.D. Iowa July 13, 2009).

The rationale behind these decisions is strong. For one, the cyberstalking statute punishes stalking with "the intent to kill, injure, harass, or intimidate," the ordinary case of which naturally involves a substantial risk of physical force. *Kukstis*, No. 4:18-mj-04174-DHH at 10 ("Conduct intended to 'kill, injure, harass, or intimidate' another implicates categorically a substantial risk of the use of physical force during the course of stalking."); *Harrison*, 354 F. Supp. 3d at 278 ("Cyberstalking . . . categorically involves a substantial risk that physical force against the person or property of another may be used"); *Grooms*, 2015 WL 1982097, at *3 (agreeing that intent to "'kill, injure, harass . . . or cause substantial emotional distress,' . . . naturally involved a substantial risk of physical force); *Shrader*, 2010 WL 503092, at *3 (same). The Court in *Kukstis*, relying on the dissent in

*Malta-Espinoza v. Gonzalez*, 478 F.3d 1080, 1086 (9th Cir. 2007), also found persuasive research conducted by the National Center for Victims of Crime and the United States Department of Justice. Specifically, this research shows that 46% of stalking victims experience one or more violent incidents by the stalker, approximately 29% of stalkers vandalize the victim's property, and 9% of stalkers kill or threaten to kill the family's pets. Indeed, "because stalking, by definition, requires *repeated* victimization, it is intuitive that there is an increased opportunity for violence." *Malta-Espinoza*, 478 F.3d at 1087 (Duffy, J., dissenting) (emphasis added). *See also* 18 U.S.C. § 2261A(2) (requiring a "course of conduct" rather than a single, isolated event).

The conclusions of these courts are further underpinned by Congress' intent in enacting the cyberstalking statute. As *Grooms* acknowledged, the statute was enacted as part of the Violence Against Women Reauthorization Act of 2005. *Grooms*, 2015 WL 1982097, at *5. Citing "the sobering statistic" that nearly one-third of American women report enduring physical or sexual abuse, "the act implicitly recognizes that stalking and cyberstalking are crimes of violence, like sexual assault, domestic battery, and dating violence, which require the appropriation of funds for the creation of hotlines, education, training, prosecution, and punishment." *Id*. *Grooms* reasoned that, against this legislative backdrop, it would be "illogical and counterintuitive" for a court to not consider whether an alleged offender poses a danger to victims and the community. *Id*. Together, these decisions stand for the consistent understanding that cyberstalking by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense, and therefore is a crime of violence under the Bail Reform Act.

  *b. No Conditions Will Reasonably Assure the Safety of Victim K and Others.*

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making an individualized detention determination, a court must consider (1) the nature and

circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Consideration of non-statutory factors is disfavored. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). The United States must establish danger by clear and convincing evidence, and must show flight risk by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

The court may reopen detention proceedings before trial if there is new information "that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other people and the community." 18 U.S.C. § 3142(f)(2).

Further, after a defendant has been detained, a court "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The defendant bears the burden of showing release is necessary under § 3142(i). *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011). Release under § 3142(i) is intended for "extraordinary circumstances," which are exceedingly rare. *United States v. Rebollo-Andino*, 312 Fed. Appx. 346, 348 (1st Cir. 2009).

> c. *No conditions Will Reasonably Assure the Appearance of Defendant at Future Court Proceedings.*

Defendant's history and characteristics support detention and demonstrate that there are no conditions or combination of conditions that can assure his appearance at future

court proceedings. He is no longer employed and should not be allowed to reside with his mother based on her statements to law enforcement. With nowhere to live and no employment, the government submits that it has established, by a preponderance of the evidence, that there are no conditions or combination of conditions that can assure his appearance at future court proceedings.

> d. *Defendant's Continued Detention is Appropriate under 18 U.S.C. § 3142 Because He is a Flight Risk and a Danger.*

In Defendant's case, the COVID-19 pandemic is not a changed circumstance that should be considered under § 3142(f)(2) as his detention hearing occurred on March 20, 2020, and by then Arizona Governor Doug Ducey had already declared a State of Emergency due to COVID-19 and this court had issued several general orders regarding COVID-19 suspending Grand Juries and criminal jury trials as well as implementing procedures to ensure social distancing. COVID-19 does not materially alter Magistrate Judge Fine's individualized determination that there are no conditions of release sufficient to assure the safety of the community. There has been no change to the nature and circumstance of the offenses, the weight of the evidence, Defendant's history and characteristics, or the nature and seriousness of the danger Defendant presents to the community in general and his victims in particular. *Cf. United States v. Martin*, 2020 WL 1274857, at \*3 (D. Md. Mar. 17, 2020) (denying appeal of detention order by inmate with asthma, high blood pressure, and diabetes and explaining that "as concerning as the COVID-19 pandemic is," the court's consideration "must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act.").

To be sure, the Bail Reform Act instructs the Court to consider a defendant's own "physical and mental health," 18 U.S.C. § 3142(g)(3)(A), but the general existence of a pandemic does not have significant bearing on that assessment. Notably, Defendant has not alleged any change in his physical condition, let alone that he or anyone else with whom he is in contact actually has been infected with COVID-19. In fact, as of today's date, there are no known cases of the virus among the staff or inmates at the CoreCivic facility where

Defendant is housed.

Even if this Court does consider the speculative risk of Defendant contracting a COVID-19 infection (and properly discount it by Defendant's risk of becoming infected in the community), Defendant's concern does not warrant release. CoreCivic has provided details regarding its extensive COVID-19 protocols. CoreCivic has protocols in place regarding COVID-19 with respect to: prevention, identification, treatment, surveillance, isolation, testing and protecting the uninfected. CoreCivic has implemented numerous measures to minimize the risk of COVID-19 transmission into and inside its facilities, including, but not limited to, the following: fails to demonstrate he is at greater risk while housed at CoreCivic than he would be if released into the community. On March 31, 2020, one inmate had symptoms of illness and was tested for COVID-19 after leaving CoreCivic for transfer to BOP. The inmate was found to be negative for COVID-19 on April 3, 2020. As to employees, a nurse who exhibited symptoms upon return from a cruise in early March tested positive. The nurse was out for 14 days and then was cleared to return to work. Even if this Court could weigh such a speculative risk and properly balance it against the risk of Defendant becoming infected in the community, his concern about potential exposure does not warrant release.

CoreCivic has protocols in place regarding COVID-19 with respect to prevention, identification, treatment, surveillance, isolation, testing and protecting the uninfected. CoreCivic has implemented numerous measures to minimize the risk of COVID-19 transmission into and within its facilities, including, but not limited to, the following:

(1) New inmates are being screened by having a full set of vitals taken, which includes checking temperatures, assessing possible symptoms (flu-like symptoms, coughing) and "chronic care" needs, along with completing an in-depth health inquiry. Based on this intake screening, new inmates will be quarantined, if necessary. New inmates are housed together and isolated from the general population for 14 days as a precautionary measure.

(2) Nurses are screenings inmates in the cellblocks in Phoenix and Tucson: testing temperatures, checking whether an inmate had an upper respiratory infection within the last 14 days and inquiring about known exposures. If they determine someone poses a risk, that inmate will be masked and possibly quarantined.

(3) Based on guidance from the Centers for Disease Control and Prevention ("CDC"), CoreCivic has identified a "high risk" watch list of inmates. The facility will be keeping a close eye on these inmates. Some of these "high risk" inmates may already be in the infirmary. An inmate will not be moved just because he/she is identified as "high risk." For example, just because an inmate is HIV positive, he/she may not be included on the list or isolated, instead, the decision is based on the individual inmate's current health situation.

(4) CoreCivic has increased sanitization measures to be more comprehensive and more frequent in accordance with CDC guidelines.

(5) All inmates are being instructed on CDC guidelines to prevent transmission of COVID-19, including the importance of frequent hand washing, covering coughs, not touching the face, etc. All inmates were provided with masks on April 13, 2020.

(6) Inmates are being tested before they leave a facility to go to court, and if they register a temperature greater than 100.4 F, they are not transported to court.

(7) Employees are screened at the beginning of each shift and are not permitted to work if they have a fever. All employees were provided with masks on April 13, 2020.

(8) CoreCivic is following CDC recommendations. They are coordinating with local health and fire departments and have contingency plans in place with local hospitals.

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission. *See* Order Denying Defendant's Motion for Release from Custody Pending Disposition or Immediate Disposition, *United States v. Caddo*, D. Ariz. No. CR-08341-002-PCT-JJT, ECF No. 174 at 2 (denying motion for release pending supervised release disposition due to COVID-19 and finding "the CoreCivic and BOP protocols for warning sign monitoring, examination, quarantining, isolation and other health procedures they have in place are comparable, if not superior, to what Defendant would face out of custody. CoreCivic's, BOP's and the Marshal's procedures have not been shown to be unreasonable under the circumstances.") and *United States v. Martin*, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (rejecting similar argument in the context of pretrial release noting that "as concerning as the COVID-19 pandemic is," the court's consideration "must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act.").

Given CoreCivic's prevention and treatment measures, the risk that Defendant will be infected with COVID-19 as a result of his detention is not clearly greater than it would be if he were released to live elsewhere in Arizona, where thousands of people are infected and screening is not mandated.

Defendant remains a danger for all the reasons articulated by Magistrate Judge Fine, such as the nature of the instant offense including his threatening and harassing behavior and the serious risk that he will obstruct or attempt to obstructs justice, or threaten to injure, intimidate a prospective witness or juror (*See* Doc. 12.)  Defendant generally claims that there are conditions supporting release but doesn't give particulars. (Doc. 16 and 17.)

Defendant also presents exactly the same danger to the community that he did at the time of the Court's original detention order—if not more.  The community is now more vulnerable to such danger given the COVID-19 pandemic that has strained government resources.  Because first responders are focused on the outbreak, they are less equipped to prevent and respond to wrongdoing.  Indeed, as a district court in Maryland recently observed, installation of location-monitoring tools now poses a risk to United States Pretrial Services officers "given the current recommendations regarding implementation of social distancing." *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020).

In light of all the information before the Court, Defendant's COVID-19 concerns should not be permitted to overwhelm the careful decision of the Magistrate Judge to detain him based on his risk of flight and danger.[3]

e. *Defendant is Ineligible for Temporary Release under 18 U.S.C. § 3142(i)*

Although defendant doesn't make this argument, Defendant is ineligible for temporary release under 18 U.S.C. § 3142(i) for the same reasons he should remain

---

[3] Furthermore, his release may infringe on the victim's right to reasonable protection provided under the Crime Victims' Rights Act (CVRA).  Specifically, a crime victim has "[t]he right to be reasonably protected from the accused."  18 U.S.C. § 3771(a)(1).  The CVRA further requires that the Court "ensure that the crime victim is afforded the rights" contained therein.  18 U.S.C. § 3771(b)(1).

detained. Defendant seeks indefinite rather than temporary release from custody, a remedy unavailable under § 3142(i). Moreover, he has not shown an extraordinary circumstance justifying release of any duration.[4] To the contrary, the facts reflect that Defendant is the beneficiary of intense—and thus far successful—efforts to insulate CoreCivic inmates from COVID-19. As outlined above, Defendant's facility has taken reasonable steps to avoid or mitigate the virus's spread. Defendant provides no evidence that those protocols or the medical services available to him are insufficient. He should remain detained.

## III. Conclusion

Defendant presents no new information for the district court to consider. Defendant is charged with a crime of violence, he remains a danger to the community, poses a serious risk that he will obstruct or attempt to obstruct justice, poses a serious risk that he will threaten, injure, or intimidate, or attempt to threaten, injure or intimidate, a prospective witness or juror and poses a serious flight risk, therefore his motion/appeal to revoke detention order should be denied.

Respectfully submitted this 20th day of April, 2020.

ANTHONY MARTIN
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
District of Arizona

*/s/ Lisa E. Jennis*
LISA E. JENNIS
Assistant U.S. Attorney

Certificate of Service
I hereby certify that on this day, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants in this case.

---

[4] Defendant does not argue he qualifies for temporary release in order to prepare his defense, which is an alternate basis for § 3142(i) relief.