**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. 20-03058MJ-001-PHX-MTM |
| Plaintiff, | **ORDER** |
| v. | |
| Chauncey Hollingberry, | |
| Defendant. | |

Pending before the Court is Defendant Chauncey Hollingberry's Motion to Revoke Detention Order (Doc. 17). For reasons that follow, the Motion is denied.

**I.   BACKGROUND**

Defendant is charged in a Criminal Complaint with one count of cyberstalking, in violation of Title 18, United States Code, Section 2261A(2). (Docs. 3, 13.) The charge arises from Defendant's alleged harassment and intimidation of the victim in this case ("Victim K") through emails and YouTube videos. The Government moved for detention. At Defendant's initial appearance, he was temporarily detained pending a preliminary hearing and detention hearing. (Doc. 7.) Defendant later waived his right to a preliminary hearing, and the Magistrate Judge found probable cause for the Complaint to proceed, based on the Complaint and accompanying affidavit. (Reporters Transcript "R.T." 03/20/2020, at 4.)

During the detention hearing, the Government moved to admit ten exhibits, which the Magistrate Judge granted without objection. (*Id*. at 5.) After hearing oral argument

and considering the record, the Magistrate Judge found that: (i) Defendant is charged with a crime of violence; (ii) that there is clear and convincing evidence he is a danger to the community; (iii) that there is clear and convincing evidence he will obstruct or attempt to obstruct justice; and (iv) that there is clear and convincing evidence he will threaten, injure, intimidate, or attempt to threaten, injure or intimidate a prospective witness or juror in this case. (R.T. 03/20/2020, at 30.) The Magistrate Judge further found that there are no conditions of release that would reasonably assure the safety of Victim K, and that there are no conditions of release that would prevent Defendant from obstructing or attempting to obstruct justice, or from threatening, injuring, intimidating (or attempting to threaten, injure, or intimidate) Victim K. (*Id*. at 34-35.) Accordingly, the Magistrate Judge ordered Defendant detained pending further proceedings. (*Id*. at 35.)

Defendant has moved, pursuant to 18 U.S.C. § 3145(b), to revoke the Magistrate Judge's detention order. (Doc. 17.) The Court has considered Defendant's Motion to Revoke Detention Order (Doc. 17), the Government's Response (Doc. 19), the Complaint (Doc. 3), the Government's Detention Memorandum (Doc. 8), the Pretrial Services Bail Report and Addendum (Docs. 5, 9), the transcript of the detention hearing, and the ten exhibits that were admitted during the detention hearing (*see* Doc. 11). For the following reasons, the Court finds that Defendant should be detained pending trial.

## II.   LEGAL STANDARD

If a person is ordered detained by a magistrate judge, the person "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). A district court's review of a magistrate judge's detention order is *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The district court must review the evidence that was before the magistrate judge and "make its own independent determination whether the magistrate judge's findings are correct, with no deference." *Id*. In doing so, the district court may, but is not required to, conduct additional evidentiary hearings. *Id*.

Under the Bail Reform Act, the United States may only move for pretrial detention

of a defendant in cases that fall into one of seven categories. 18 U.S.C. § 3142(f)(1)(A)-(E), (2)(A)-(B). Four of these categories center on the nature of the crime charged, including whether the defendant is charged with a crime of violence. *See* 18 U.S.C. § 3142(f)(1)(A), (B), (C), (E). The remaining categories involve cases in which the defendant has a particular set of prior convictions, cases that involve a serious risk of flight, and cases involving obstruction of justice, witness tampering, or jury tampering. 18 U.S.C. § 3142(f)(1)(D), (2)(A)-(B). The Government has the burden to show by a preponderance of the evidence that a case falls into one of these seven categories. *See United States v. Fanyo-Patchou*, 426 F. Supp. 3d 779, 782 (W.D. Wash. 2019) (*citing United States v. Friedman*, 837 F.2d 48, 49 (2d. Cir. 1988).

If the Government makes a threshold showing that the defendant is eligible for a detention hearing, the Bail Reform Act requires the Court to consider certain factors in determining whether to detain or a release the defendant: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against Defendant; (3) the history and statutorily specified characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release. 18 U.S.C. § 3142(g)(1)-(4). The Court must release a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

III. **ANALYSIS**

    A. **Eligibility For Detention**

As a threshold matter, the Court finds by a preponderance of the evidence that Defendant is charged with a crime of violence, and that the case involves a high likelihood he will threaten, injure, or intimidate a witness. 18 U.S.C. § 3142(f)(1)(A), (2)(B). Defendant was therefore eligible for a detention hearing on each of these independent grounds.

### 1. Crime of Violence

A crime of violence under the Bail Reform Act means: "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" ("elements clause") or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" ("residual clause"). 18 U.S.C. § 3156(a)(4)(A), (B).[1] Only the residual clause is relevant to this case because cyberstalking does not have as an element the use, attempted use, or threatened use of physical force against the person or property of another. *See* 18 U.S.C. § 2261A(2).

To determine whether an offense is a crime of violence under the residual clause, courts in the Ninth Circuit have employed a categorical approach. *See*, *e.g.*, *United States v. Montoya*, 486 F. Supp. 2d 996, 1002-1003 (D. Ariz. 2007). Under the categorical approach, the Court does not evaluate the specific facts of a case or the elements of the crime. *See Sessions v. Dimaya*, --- U.S. ---, 138 S. Ct. 1204, 1211 (2018) (evaluating the residual clause in the Immigration and Nationality Act). Instead, the Court considers whether "the ordinary case" of an offense presents a substantial risk that physical force against the person or property of another will be used in the course of committing the offense. *Id*.

The Government argues, and Defendant does not dispute, that under this categorical approach, cyberstalking is a crime of violence under the residual clause of the Bail Reform Act. (Doc. 8 at 3-4); (R.T. 03/20/2020, at 24-26); (Doc. 17.) The Court agrees. Title 18 U.S.C. § 2261A(2) provides that:

> Whoever—
>> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or

---

[1] The definition of "crime of violence" also includes specific felonies, which do not pertain here. *See* 18 U.S.C. § 3156(a)(4)(C) (including "any felony under chapter 77 [human trafficking], 109A [sexual abuse], 110 [sexual abuse and other exploitation of children], or 117 [human trafficking for sexual activity] . . . ").

- 4 -

>  any other facility of interstate or foreign commerce to engage in a course of conduct that—
>  (A) places that person in reasonable fear of the death of or serious bodily injury to a person described in clause (i), (ii), or (iii) of paragraph (1)(A); or
>  (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),
>  shall be punished as provided in section 2261(b) of this title.

Although the Ninth Circuit has not yet considered whether cyberstalking is a crime of violence under the Bail Reform Act, the Court finds that because the crime involves stalking with "the intent to kill, injure, harass, or intimidate"—and because stalking requires repeated victimization through a "course of conduct"—there is a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. *See also United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D. N.Y. 2018) (finding that cyberstalking categorically is a crime of violence under Bail Reform Act); *United States v. Grooms*, No. 3:15-mj-00025, 2015 WL 1982097, at *5 (S.D. W. Va. Apr. 29, 2015) (Bail Reform Act implicitly recognizes that stalking and cyberstalking are crimes of violence); *United States v. Shrader*, No. 1:09-cr-00270, 2010 WL 503092, at *3 (S.D. W. Va. Feb. 8, 2010) (same); *United States v. Neuzil*, No. 09-CR-2020-LRR, 2009 WL 2030373, at *2 (N.D. Iowa July 13, 2009) (same).  Accordingly, the Court will treat cyberstalking as a crime of violence under the Bail Reform Act and find that Defendant was eligible for a detention hearing.

### 2. Serious Risk of Threatening, Injuring, or Intimidating a Prospective Witness

Under 18 U.S.C. § 3142(f)(2)(B), detention is available in any case where there is "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." The Magistrate Judge found that Defendant had "weaponized the internet" and "created a strong, clear, ambient violence to surround Victim K in every aspect of her life."

(R.T. 03/20/2020, at 32.) For reasons made even clearer below, the Court agrees that there is serious risk Defendant would continue to threaten or intimidate Victim K (or attempt to do so) if released. To summarize, Defendant amassed approximately 3,000 followers on his YouTube channel and repeatedly shared Victim K's picture, home address and email address online. On numerous occasions Defendant directed his followers to harass victim K by emailing her, calling her, and contacting her at her home address. His followers responded by posting derogatory comments about Victim K—one even suggested that Defendant deliver "9mm sleeping pills" to her home address. In sum, the Court agrees with the Magistrate Judge that there is a serious risk Defendant, if released, will obstruct or attempt to obstruct justice, and that he will threaten or intimidate Victim K. Accordingly, the Government was additionally entitled to seek detention on this basis.

### B. Nature And Circumstances of The Offense Charged

Turning next to the underlying circumstances of Defendant's alleged cyberstalking offense, the Court finds that the evidence tends to show he is a danger to Victim K. The Complaint alleges that in July 2018, Defendant entered the Arizona Attorney General's Office ("AGO") and started videotaping in the lobby with a handheld recording device. AGO employees approached Defendant and told him that videotaping in the lobby was prohibited, but Defendant continued to videotape. When Defendant asked an AGO employee to identify the law that restricts videotaping in the lobby, the employee told Defendant to make a public records request.

The next day, Defendant returned to the AGO to submit his public records request. Defendant proceeded to videotape in the lobby, and the Phoenix Police Department ("PPD") was notified. Defendant was eventually cited with trespassing. Victim K, an AGO employee, provided PPD with a copy of the surveillance video from the day prior. PPD's interaction with Defendant and Victim K was captured by one of the officer's body cameras. Defendant later obtained the body camera footage, which revealed Victim K's face and her full name, and uploaded it to his YouTube channel, "Law Offices of Daddy

& Master."[2]  YouTube removed the body camera footage after Victim K and two other AGO employees filed privacy complaints with YouTube. Defendant then proceeded to launch a campaign of retaliation against Victim K and the AGO.

In January 2020, Defendant posted numerous videos to his YouTube channel, which collectively and individually received thousands of views. In one video, titled "War on the attorney generals [sic] office," Defendant indicated that he was going to go "to the Attorney General's Office with a mask on, multiple cameras and . . . file a complaint against that bitch that works in the office that's doing these privacy complaints and I'm gonna be outside the Attorney General's Office with a megaphone and I'm going to be getting everyone's license plates. I'm going to be posting everyone's home address on my personal domain . . . ."

In another posted video, titled "Emergency Alert Mirror the police body cam video," Defendant asked his YouTube followers to repost the PPD body camera footage that had been previously removed by YouTube. One of Defendant's followers commented on this video with Victim K's name, address, and phone number. Another commenter stated that Victim K "belongs on federal death row for treason."

On January 14, 2020, Defendant returned to the AGO with two cameras. He live-streamed this visit to his YouTube channel, and later uploaded the video with the title "Attorney General Office." In this video, Defendant tells his viewers to flood the AGO with phone calls. The video depicts Defendant walking around the AGO lobby, narrating his activities. Defendant asks his viewers in the video to post Victim K's home address in the chat and then he shows his viewers her office door, which was visible from the lobby. Later in the video, Defendant states Victim K's full name and address numerous times, to which one viewer commented that Defendant should "go knock on that door tonight." Another viewer commented that he should send "9mm sleeping pills to that beefy address."

The same day Defendant uploaded another video, titled "Message to AG Office," wherein he shows a photograph of Victim K and lists her job title. Defendant says the

---

[2] Defendant is not a lawyer.

- 7 -

AGO is wasting time trying to stop him from publishing "public records" because he "do[es] this all f**king day and [he] will f**k your life up if you keep doing this."

Two days later Defendant uploaded another video to his YouTube channel, depicting images of Victim K and another AGO employee. One viewer commented that he was working on finding Victim K's address and the identity of all the people who live at her address.

In another video, titled "AG Office Mugshot," Defendant identifies an arrest record of Victim K, displays a mug shot, and states that she was arrested in 2014 for possessing marijuana and drug paraphernalia. A few days later Defendant posted another video, titled "AG office Declares War," wherein Defendant indicated he would be sending everybody in the AGO Victim K's mug shot and nude photos of her. He also asked his followers to "bomb" the AGO with emails containing profanity.

On January 20, 2020, Defendant posted a video, which appeared to be live-streamed from inside a vehicle during the night. In this video, Defendant stated, "I do have level five body armor. There's a reason why I'm saying that, and uh, but I won't go into it now, and then also let's see, I think tomorrow I'm going to go to the gun range. So there's a reason why I'm saying these two things . . . but uh, we'll see what happens with the Attorney General. He's allegedly in a fetal position in the back, so, okay, gotta go."

In another video, Defendant tells his viewers how to email AGO employees and indicates that he emailed Victim K's mugshot and nude photos to one hundred people. He proceeded to say, "I don't care how much money or how much time it takes, I'm taking that b*tch down, and whoever is doing these privacy complaints, I will own them."

Between January 19 and 20, 2020, Defendant sent multiple emails to AGO employees, government officials, and local news outlets, complaining about the AGO and Victim K's actions to remove the body camera footage from YouTube. He also indicated that he was running Facebook ads with Victim K's mugshot. In another email titled "NUDE PHOTOS," Defendant stated that nude photos of Victim K in a compromising position could be found on the internet.

Defendant was served by AGO special agents with an Injunction Against Workplace Harassment on January 24, 2020. The agents had to explain the injunction to Defendant through his car window and leave it on his windshield because he refused to open his car door and accept the document when the agents approached him. The injunction ordered Defendant not to have any contact with Victim K and the Arizona Attorney General, and it ordered him to immediately turn over any firearms he possessed.

Defendant posted additional videos in February 2020, one of which indicated that he had posted Victim K's mugshot and his videos to his new website, "paralegal.legal." Also on his website, he posted a video titled "False Arrest! Arizona Attorney General First Amendment Audit," below which he wrote "[Victim K] the big bitch at the Attorney General's Office Can't take this down." Defendant also posted the police body camera footage on his website.

In February 2020, Defendant posted a poll on his YouTube channel, asking viewers to vote if he should audit a Synagogue on the public sidewalk with body armor, an AR-15 assault rifle, and a camera. He also sent an email to his uncle's attorney, pertaining to unrelated litigation, in which Defendant stated, "I hope your client dies that is my number one goal in my life at this time."

As a result of Defendant's anger toward Victim K, and his continued support from YouTube viewers, Victim K allegedly received messages containing vulgar and disparaging comments toward her. Defendant's followers have also threatened Victim K in their comments on his posts, as well as through emails and phone messages. As a result of Defendant's conduct, Victim K was assigned a security detail that followed her to and from work. She feared leaving her home.

The circumstances before the Court show that Defendant's course of conduct was part of an attempt to retaliate against Victim K for filing the privacy complaint with YouTube. He displayed intense animosity toward her and was successful in getting some of his followers to harass her, too. Defendant also showed up at Victim K's workplace and located her office. Because some of Defendant's videos additionally mention body armor

and an AR-15 assault rifle, it is legitimate that Victim K fears for her life and the life of her family members. (*See* Exhibit 1) (letter from Victim K). The circumstances surrounding the offense weigh in favor of detention.

### B.     The Weight of The Evidence Against Defendant

The weight of the evidence against Defendant on the charges is the least important of the factors to be considered in making the detention decision. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). But as the Government pointed out, the weight of the evidence in this case is particularly strong because the records of the alleged offense are largely preserved in emails, videos, and recorded voicemails. (*See* Exhibits 5, 10); (R.T. 03/20/2020, at 23.) The Court therefore assigns some weight to the strength of the evidence against Defendant.

### C.     History And Statutorily Specified Characteristics of Defendant

In determining whether there are conditions of release that will reasonably assure the safety of any other person and the community, the Court must take into account the defendant's history and characteristics, "including (A) the [defendant's] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3)(A), (B).

The Court notes the absence of reported drug and alcohol abuse in the Pretrial Services Report, and that Defendant has maintained a steady residence, with longtime ties to the Arizona community. (Doc. 5.) The Court also considers that the Pretrial Service Report notes mental health concerns. (*Id*.) Defendant has no felony convictions. But he previously pled guilty to a misdemeanor for failing to obey a police officer. (*Id*.) And although the case was ultimately dismissed, Defendant was recently arrested for aggravated assault, for allegedly striking a security guard in the face with a cellphone that was attached

to a tripod. (Docs. 5, 8); (R.T. 03/20/2020, at 26.) Particularly concerning to the Court, however, is Defendant's past conduct of similar conduct toward other individuals. The Government submitted two additional restraining orders, both of which were recently issued in response to similar stalking behavior. (*See* Exhibits 1, 2, 3). These restraining orders, in conjunction with Defendant's comments about his readiness to use "level five body armor" and an AR-15 assault rifle, weigh heavily in favor of detention.

### D. Nature And Seriousness of The Danger to Persons or The Community

The Court finds that there are is no condition or combination of conditions that will reasonably assure the safety of the community, including Victim K. Defendant argues that the Court can remediate any potential danger to Victim K by restricting his access to a computer and limiting communication with his YouTube followers. (R.T. 03/20/2020, at 25.) The Court disagrees. In addition to weaponizing the internet and encouraging his 3,000 YouTube followers to harass Victim K, Defendant has also physically visited the place where Victim K works, with the intent to harass, threaten, and intimidate her. He also knows her home address and has utilized phones to place harassing phone calls to her. The Court additionally notes a consistent pattern of similar behavior toward other individuals, including an uncle whom Defendant threatened in an email to kill. Because Defendant has utilized a combination of the internet, telephones, and in-person contact to harass and threaten members in the community, including Victim K, the Court finds that there are no conditions or combination of conditions that will reasonably assure the safety of the community.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** denying Defendant's Motion to Revoke Detention Order (Doc. 17).

Dated this 28th of May, 2020.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge